CITIZENS BANK OF COLDWATER *v.* CALLICOTT *et al.*

(Division B.   April 26, 1937.)

[174 So. 78.   No. 32704.]

Herbert Holmes, of Senatobia, for appellant.

750

751

James McClure, of Sardis, for appellees.

Argued orally by **Herbert Holmes**, for appellant, and by **James McClure**, for appellee.

**Ethridge, P. J.**, delivered the opinion of the court.

Mrs. W. C. Callicott, deceased, at her death, owned a pair of blue white diamond earrings, and, on the night of her death her husband, W. C. Callicott, delivered them to E. C. Turley, then the cashier of the bank, to be placed in the bank. E. C. Turley took them the following morning to the bank and placed them in a screw safe on a shelf where the bank kept its large cash and other valu-

ables. Subsequently, E. C. Turley resigned as cashier, and W. H. Newton, assistant cashier, succeeded him, and, during the period Newton was cashier, the diamond earrings were shown to some member of the family and were kept in this screw safe, which was a safe place against every one except the officers of the bank. The said diamond earrings were placed in the bank in November, 1931, and were kept there until late in 1935, when demand was made for them and the bank was unable to find them. In the latter part of 1935, Newton was discharged or suspended from the bank because of his excessive use of intoxicating liquors, and, while he was at home taking treatment to cure him of this habit, the diamond earrings were missed, and an officer of the bank was sent to interview him, and he stated to this officer that they would be found at a place on the shelf in the screw safe, but a diligent search failed to locate them.

Consequently, suit was instituted against the bank for the value of the diamonds, and on final hearing judgment was rendered against the bank for $1,700, from which this appeal is prosecuted.

It is contended that the bank was not liable for the value of the diamonds because they were delivered to E. C. Turley at night, after banking hours, and that there was no showing that the bank was authorized, by its charter, to receive diamonds, or other valuables, for safekeeping.

The proof shows that it was customary for the bank, at the request of its depositors, to take papers and other valuables of like nature, for safekeeping. It is not shown that it kept any other diamonds than the ones involved in this litigation, but the bank, acting through its cashier, did take and place in the screw safe valuables of its customers for safekeeping. Callicott had an account at the bank prior thereto, and during all the period involved in the case, between the reception of the diamonds by the bank and demand for their return.

We think the bank was liable for the value of the diamonds under the facts shown in the record under the authority of the case of Grenada Bank v. Moore, 131 Miss. 339, 95 So. 449, where it was said that, where a bank accepts special deposits, and its managing officer subsequently converts the securities to his own use, even though a gratuitous bailee, the bank is liable to the depositor for the loss, regardless of whether such loss is occasioned by mere negligence or fraud, the act of conversion, by the controlling officer, being, in effect, the act of the bank itself. This case is also authority for the proposition that the bank is not a gratuitous bailee where it invites and accepts special deposits as accommodation to its customers. We think the proof was ample to sustain liability.

However, in our opinion, the proof is insufficient to sustain the amount of the judgment. It was not shown what the diamonds involved in the case at bar were worth at the time of Mrs. Callicott's death or what they cost, nor was it shown, by any dependable testimony, as to what was their quality, except that they were two carat diamonds of good appearance and sparkle, with no visible to the eye defect therein. Mr. Callicott testified that, while he bought the diamonds for his wife, he was not a judge of diamonds. The son of Mr. Callicott and his wife undertook to testify that the son's wife owned diamonds of similar color and sparkle, but smaller, which they took to Brodnax, in Memphis, Tenn., and that her diamonds were valued at $1,109, and she undertook to say, by comparison, that the diamonds owned by Mrs. Callicott at the time of her death were worth $2,250; but she frankly admitted that she was not an expert as to the value of diamonds. The son also had a diamond purchased some years ago from Brodnax, and he testified that he wrote in 1933 to Brodnax as to the value of his diamond, but neither the son nor his wife disclosed who made these valuations, or produced a person competent to testify as to the nature and quality of

diamonds. The son testified that he had the ability to distinguish a real from a fake diamond, but admitted that he was no expert and did not know the market value of diamonds.

Another party testified that, in 1919, he bought a couple of diamonds on the Coast, one seven-eighths carat, and the other less in size, paying for one $100 and for the other $65.

It was also shown that the diamonds involved in this litigation were purchased several years before the death of Mrs. Callicott, from a Memphis firm which had gone out of business, but there was no effort, so far as the record shows, to discover any of the parties in that firm, nor where the books were. There were no depositions taken of any person dealing in diamonds to establish actual values of either the diamonds involved in this litigation, or the diamonds owned by the son's wife.

The proof in the case is that the value of diamonds varies greatly at different periods, much depending, not only upon the quality, but upon the financial condition of the people who buy such valuables.

In a case dealing with subjects like diamonds, it is highly important that persons with competent knowledge thereof be produced to testify as to value. The majority of people are not competent judges of such values.

It is familiar learning that it is the duty of parties seeking to recover values of articles lost or converted to produce dependable evidence as to their value, and it is also a familiar rule that the best evidence capable of being produced must be produced.

In Jones on Evidence (3 Ed.), sec. 387, at page 584, it is said that the essentials are, "First, a knowledge of the intrinsic properties of the thing, Secondly, a knowledge of the state of the markets."

None of the witnesses produced here sufficiently qualified to testify as to the nature, quality, or market value of the diamonds at the time the demand was made upon the bank for their redelivery to the owners. In 22

C. J., section 682, page 578, it is said that: "While witnesses are not required to be expert or skilled in the strict and severe sense of the term in order to give opinions on value, and while there is no inflexible rule defining how much a witness must know in order to be so qualified, it must be made to appear that he has had, and utilized, means superior to those available to the jurors, for forming an intelligent opinion. In most instances an owner is deemed qualified by that relationship to testify to the value of common classes of property. The primary qualification of other witnesses is adequate acquaintance with that class of property, whether real or personal, and knowledge of the market thereof."

It is, of course, familiar learning that hearsay evidence is not admissible. Illinois Cent. R. R. Co. v. Ruffin (Miss.), 3 So. 578; Barclay v. Smith (Miss.), 36 So. 449; Board of Levee Commissioners v. Nelms, 82 Miss. 416, 34 So. 149. In Alabama & V. R. R. Co. v. Searles, 71 Miss. 744, 16 So. 255, it was said that the fact that a party produces the best evidence he has, or could be expected to have, does not exempt him from the rule which requires evidence sufficient to satisfy the jury. See, also, on a comparison of values the cases of State Highway Comm. v. Buchanan, 175 Miss. 157, 158, 165 So. 795, 166 So. 537; Board of Levee Commissioners v. Dillard et al., 76 Miss. 641, 25 So. 292; Mississippi Digest, Evidence, Key No. 474; and Whitfield v. Whitfield, 40 Miss. 352; 22 C. J. 575, section 680.

From what has been said, it follows that the judgment as to liability is affirmed, but the case is reversed and remanded for a new trial on the question of value.

Affirmed in part, and reversed and remanded in part.